Marshall, C. J.
On February 20, 1921, at about 9 o’clock P. M., in the eastern portion of the city of Cleveland, Ohio, the defendant Habig, and two companions, after having made the rounds of several drinking places where intoxicating liquors were obtained, planned among themselves to rob the first person who should come along, and for this purpose secreted themselves within the shadow of a building adjacent to a vacant lot, and soon thereafter did hold up and rob a victim. While so doing a man named Jennings and his wife passed by, and they were also held up, and Jennings was robbed of $32 and a watch, and while this robbery was going on a third man named Okras passed along the opposite side of the street, and Habig ran across to hold him up, but Okras proved to be a blacksmith, who promptly knocked Habig down, and thereupon Habig called to his companions for assistance, who immediately left Jennings and ran across the street, where one of them struck Okras over the head with some instrument, probably a revolver, thereby releasing Habig. Thereupon all three started to run.
The three robberies occurred on Sylvia avenue, somewhere between 147th Place and 152d street.
Immediately after the robbers left Jennings, he, Jennings, ran to the corner of 152d street and Sylvia avenue, where he found two policemen, Ball and Dyke, and notified them that a robbery had been *154 committed, and the two officers immediately ran westwardly on Sylvia avenue toward 147th Place and observed the robbers turning from Sylvia avenue northwardly into 147th Place. Dyke, being untrammeled by heavy clothing, was in advance of Ball, and when they arrived at 147th Place Ball stopped to talk to one of the victims of the robbery, which permitted Dyke to further increase his lead. Dyke apparently ran north of 147th Place to the next intersecting street, and then crossed a vacant lot, which permitted him to intercept the robbers on the next intersecting street running east and west, known as Westropp avenue, and to come face to face with them on Westropp avenue near the corner of 147th Place. When Dyke attempted to halt the robbers he was shot by one of them and fatally wounded, and died several weeks later as the result of the wounds thus inflicted. When the patrolman Ball arrived on the scene Dyke was lying on the pavement still firing his revolver, and the robbers were disappearing from sight. The defendant Ha-big received a bullet wound in the neck, but was able to accompany one of his companions, and went to the home of a friend, and the two were taken in an automobile to Mentor, and from there to Collinwood. The next day they returned.to Cleveland, where they were arrested.
When Habig was arraigned he at first pleaded not guilty, and a time was fixed for trial; but later he changed his plea to that of guilty, and thereupon the court proceeded to examine witnesses to determine the degree of the crime.
The indictment contained two counts, each charging Habig with murder in the first degree, the first *155 charging murder in the first degree with premeditation and malice aforethought, the second charging murder in the first degree committed in perpetrating or attempting to perpetrate robbery. After a full and fair hearing, in which a large volume of evidence was offered on the part of the state and no material evidence was offered on the part of the defense except the testimony of Habig himself, the court found that the evidence did not sustain the first count of the indictment, but did sustain the second count of the indictment, and that the degree of the crime was that of murder in the first degree. The trial court thereupon sentenced the accused to death in the electric chair.
Error was prosecuted to the court of appeals of Cuyahoga county, and that court reversed the judgment of the trial court on the ground that the robbery had entirely ceased and that therefore the homicide had not been committed in the perpetration of the robbery.
One of the questions before this court for review is whether the court of appeals erred in reversing the judgment of the trial court and in declaring upon the facts as shown by the record that the homicide was not committed in the perpetration of a robbery.
In determining this question we have carefully read the entire record, not with the purpose of weighing the testimony, and not for the purpose of substituting the judgment of this court for that of the court of appeals upon the facts, but for the purpose of determining whether the evidence of the defendant Habig, when considered in its most favorable light toward the accused, shows that the homicide was committed by him in the perpetration of a robbery.
*156 Habig made a signed statement, which was.properly introduced in evidence, and while it is not our purpose to quote the entire statement we will quote that portion beginning at the point where Habig left Jennings to run across the street toward the third victim:
“There was a fellow across the street opposite to where we were and I ran across the street and told him to stop and he started to run and I grabbed him by the arm and he knocked me down and falling on top of me. Nick and Mert ran across the street and started to hit him on the head. We all got up and ran. The people started out of the houses as they had heard the man holler when he was hit on the head by Nick and Mert. When we started to run, we ran about two squai'es, when an officer came up behind us and hollered, ‘Hands up.’ We walked about three or four steps without stopping and I stopped and looked around and the officer fired one shot, striking me in the neck. About five seconds after I was shot, I heard another shot and saw that the officer was shot. I hollered ‘Oh, I am shot’ and me and Mert ran together and Nick ran the other way. We. ran to Jurotovick’s pool room and Mert got some one with a machine to take me to Willoughby. I don’t know the doctor’s name that he took me to, it was out there where he lives and the doctor said that he could not do anything for me and that I would have to go to a hospital in Cleveland. Mert said, ‘All right.’ They drove me down in Willoughby and they pulled up in front of some house and me and Mert got out. Tony Grego said that he would come on the next day to take us to a doctor some place. So we waited the next day un *157 til 1 p. ru. and lie did not come, so we met a fellow and Mert hollered at him to stop and he brought us over to Calcutta avenue. There I was arrested.”
In his oral testimony Habig stated that after his companions had released him from the victim Okras, they ran westwardly on Sylvia avenue about one hundred feet and then proceeded to walk slowly two or three squares. They then turned north a distance of two squares to Westropp avenue and again turned east and were intercepted by officer Dyke near the comer of 147th, street. There is apparently some difference between the testimony of witnesses for the state and the testimony of defendant Habig as to the course pursued, but the difference is not great; neither is it important. In either event the accused and his companions were taking a devious course, evidently for the purpose of evading pursuit, and not for the purpose of going to any •particular place, as was afterward clearly shown by the fact that they procured a friend to take them out of the city. It is further apparent from the testimony of Habig that no plans of escape had been made before the crime was committed. In the written statements of Habig it was stated that the flight had covered about two squares, while according to his oral testimony the flight may have covered as many as four or five squares. But in either event the distance was not great. The time which elapsed between the time of leaving the last victim, Okras, and the time of the homicide was estimated by Habig at fifteen minutes, but it is apparent that the distance of five squares must have been covered in much less time. It is altogether probable that the distance was covered in approximately five minutes. *158 In. this view of the case, approximately five minntes elapsed from the time of the hold-np until the homicide was committed. Habig was in the act of fleeing with his companions in crime from the scene of the hold-up, in possession of the property taken from their victims, being pursued from the very first by one of the victims, and almost immediately thereafter by two policemen, one of whom overtook the robbers within the space of a few minutes and within the space of not more than five squares from the scene of the hold-up. The defendant Habig does not deny having fired his revolver, though he attempts to show that the policeman had fired first. The dying statement of the patrolman Dyke was to the effect that the robbers fired first and that he had fired after them as they ran. There is some corroboration of the dying statement of Dyke to be found in the character of the wound received by Habig, but the question of who fired the first shot is not material to the present inquiry.
The important facts from which this legal question must be solved are that a robbery had been fully executed by Habig and his companions and that one of the victims started immediate pursuit of the robbers while another victim promptly sounded the alarm and started two policemen in pursuit; that the flight covered only a few minutes of time and approximately five city squares in space, the robbers at the time carrying the proceeds of the robbery; and that instead of submitting to arrest upon being intercepted Habig shot the policeman and inflicted wounds which resulted in his death.
The first and most important legal question for determination is whether this homicide was com *159 mitted in perpetrating a robbery. A1 logical inquiry into this question requires that we should first look to the provisions of Section 12100, General Code: “Whoever, purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or attempting to perpetrate rape, arson, robbery or burglary, kills another is guilty of murder in the first degree and shall be punished by death unless the jury trying the accused recommend mercy, in which case the punishment shall be imprisonment in the penitentiary during life.”
Habig was found not guilty of deliberate and premeditated murder and we must therefore inquire into the elements of the crime of robbery and apply the essential definition of that crime to the facts of this controversy. Section .12432, General Code, provides : “Whoever, by force or violence, or by putting in fear, steals and takes from the person of another anything of value is guilty of robbery, and shall be imprisoned in the penitentiary not less than one year nor more than fifteen years.”
It will therefore be seen that the commission of the crime necessarily includes not only the violent and forcible taking but also the felonious carrying away of the proceeds of the robbery. It is argued with both force and logic that the crime is complete when there has been a violent and forcible taking, though the asportation of the goods may be ever so slight, and from this it is claimed that when the crime of robbery is once complete any homicide thereafter committed, connected with the robbery, is not a commission of homicide in perpetrating a robbery. It is quite clear that the crime of robbery is not complete without some carrying away, and the *160 only question which can arise in this connection relates to the distance the goods must be carried, and the circumstances under which they are carried, in order to segregate the continued asportation from the crime itself. Though the crime of robbery is complete with only a slight asportation, yet, if the carrying away is in fact a long distance, the crime is still in process of commission if pursuit of the robber is immediately begun and continued without interruption until the flight has carried the perpetrator to a place of seeming security, or until uninterrupted pursuit is no longer continuously active. The mere fact of delay in beginning the pursuit until an alarm can be sounded and pursuit organized and instituted does not necessarily segregate the flight and prevent it being part and parcel of the crime. As soon as the money and watch were forcibly taken from Jennings the crime was complete in the sense that a prosecution could have been predicated thereon if no further acts had been committed, but it was not complete in the sense that the subsequent asportation of the property from the scene of the crime would not be a part of the crime. A former well-considered case and clearly-written opinion of this court lends much light toward clarifying this question. In the case of Conrad v. State, 75 Ohio St., 52, it was held:
“1. The rule as to strict construction of penal statutes does not require the courts to go to the extent of defeating the purpose of the statute by a severely technical application of the rule.
“2. Where one starts to carry out the purpose to commit a rape, arson, robbery or burglary, and Mils another under circumstances so closely con *161 nected with the crime which he has undertaken as to be a part of the res gestae thereof, he is guilty of murder in the first degree, within the meaning of Section 6808 of the Bevised Statutes [now Section 12400, General Code], whether the crime which he originally undertook has been technically completed or not.”
That pronouncement of law in the syllabus applied to the facts of the case stated in the opinion makes that case a controlling authority in the instant case. In the Conrad case burglary was the crime being perpetrated while the homicide was committed, and the crime of burglary was complete upon the felonious breaking and entering with the intent to steal; and in such case it was not necessary that any property be taken and carried away. The homicide was in fact committed after Conrad had left the dwelling, in an effort to escape. If the arguments tendered by counsel for the accused in the instant case were applied to the facts of that ..ease, then Conrad could not have been guilty of first degree murder after leaving the house which he had broken into. But in the instant case there must necessarily be the further element of asportation for a shorter or a longer distance.
Keeping in mind this difference between the crimes of burglary and robbery, it is interesting to note the opinion of this court in the Conrad case, as found on page 70:
“The burglar must go to the building, he must break and enter it; he may effect his purpose or attempt it, and he must come away; for the very nature of the transaction implies that the burglar wilJ not remain in the building. An infinite variety of *162 things may happen in carrying ont the crime. The perpetrator may kill a man while going to or trying to enter the building, he may kill a man after he has broken and entered the house, and he may kill a man while trying to escape, either in the house or outside of it. Can any sound reason be suggested why the killing in any one of these instances might be in the perpetration of or attempt to perpetrate a burglary, and not so in the others? The crime of murder in the first degree as defined by the statute (Section 6808, Revised Statutes) certainly can not by any reasonable construction be confined to the moment of breaking and entering the house, the crucial point of the definition of burglary.”
In the opinion in that case there was a discussion of a number of authorities which were pertinent to and strongly supported the conclusion reached. We do not deem it necessary to again discuss those authorities. We are, however, cited to additional authorities worthy of attention by counsel in the in: stant case:
In the case of Francis v. State, 104 Neb., 5, a conviction of first degree murder was affirmed. The crime being perpetrated was burglary, and the burglar had escaped from the building and had traveled something less than a mile pursued by officers, and the decedent met his injuries and death that far from the scene of the burglary.
In the case of Christian v. State, 71 Tex. Crim. Rep., 566, four negroes had burglarized a railroad freight car and had thrown certain boxes therefrom and loaded them into a wagon to remove them from the premises. The decedent, a deputy sheriff, being informed of the burglary, went to the premises to *163 apprehend the criminals, and secreted himself behind a gatepost that the burglars must pass in order to leave the right of way of the railroad. When the officer commanded them to halt, one of the burglars shot him, and he died from his injuries the following day. The conviction of first degree murder was affirmed.
From 1 McClain on Criminal Law, page 327, we quote: “The hilling is committed in the perpetration or attempting to perpetrate one of the named felonies if it occurs at any time while the perpetrator is engaged in any acts immediately connected with such felony, even though the felony may have been already completed.”
. In the case at bar, while the crime of robbery had sufficiently progressed to support a conviction against Habig for that crime, he was nevertheless still engaged in his felonious purpose, that of carrying away the proceeds of his crime, and there had been no division of the spoils, neither had the conspirators reached a place of seeming security, nor had their continuous flight come to an end. The alarm was so quickly sounded, the pursuit so immediately begun, and so continuously pursued to the point where the homicide was committed, that the conclusion must be reached that the homicide was committed by Habig while perpetrating the robbery, and as a part of the res gestae.
The next question presented for determination is whether or not the trial court is empowered to receive a plea of guilty in a first degree murder case and to proceed under authority of Section 13692, General Code, to take testimony to determine the degree of the crime. It is urged that this section is *164 in conflict with Section 12400 by reason of the fact that the latter section makes provision for the jury trying the accused to recommend mercy, thereby reducing the punishment to imprisonment in the penitentiary during life. Section 13692 makes no express provision for recommendation of mercy on the part of the court, neither is any other statutory provision found which specifically gives such power to the court. The question therefore arises whether there is a conflict between the two sections and whether the enactment of the amendment to Section 6808, Eevised Statutes, now Section 12400, General Code, found in 93 Ohio Laws, 223, whereby authority is conferred upon the trial jury to recommend mercy, was intended to repeal that portion of Section 7316, Eevised Statutes, that is now Section 13692, General Code.
At the time of the amendment of Section 6808, Eevised Statutes, Section 2 of that enactment provided “that section 6808 and all other sections and parts of sections of the Eevised Statutes of Ohio inconsistent with the provisions of this act, be and the same are hereby repealed, and this act shall include pending prosecutions and take effect from and after its passage.”
We are of the opinion that if there ever was any doubt that the legislature intended that the court should continue to have power to receive a plea of guilty in first degree homicide indictments, that doubt has been removed by the enactment of the provisions of the General Code of 1910 wherein the provisions of Section 7316, Eevised Statutes, without material change, were re-enacted as Section 13692, General Code. The amendment of Section 6808, *165 Revised Statutes, hereinbefore referred to, was made in 1898, and whatever doubt upon this subject may have existed prior to 1910 no longer exists.
It is further urged that the acceptance of the confession in open court operates as a denial of the right of trial by jury and that this right cannot be waived by the accused. This question has recently been before this court in State, ex rel. Warner, v. Baer et al., Judges, 103 Ohio St., 585, in which there was a review of the authorities on the question of the right of persons accused of crime to waive the right of trial by jury, and it is therein declared that jury trial is a privilege and not a guaranteed right which will be imposed upon the accused notwithstanding his willingness to waive such privilege. In that case it was pointed out that this court had approved and affirmed a case where a confession of guilt in open court had been received and the degree of the crime determined and sentence pronounced accordingly. (Craig v. State, 49 Ohio St., 415.) The case of Conrad v. State, supra, is another case in which this authority was exercised by the trial court. In neither of those cases was the question considered or decided.
We are of the opinion that Sections 12400 and 13692, General Code, should be administered together and should be so construed as to harmonize their operation. It was the undoubted legislative intent that all persons guilty of murder in the first degree,' whether so found by the verdict of a jury or established by confession in open court, should have mercy if the facts and circumstances warranted it. This authority was in terms conferred only upon the jury, but Section 13692 confers upon the court *166 certain powers which render the action of a jury unnecessary. The accused has confessed his guilt of homicide, thereby waiving the determination of a jury upon that question, but has not waived all consideration of the question of mercy. No legislative provision having been made for impaneling a jury after a confession of guilt in open court, it must be held that the legislature intended that all functions of the jury that could be exercised in defendant’s behalf might lawfully be exercised by the court.
The third and last legal question presented is the contention that by the revision and consolidation act of 1910, whereby the General Code was enacted, all the laws then on the statute books were repealed and not constitutionally re-enacted.
Section 16, Article II of the Ohio Constitution, provides: “No bill shall contain more than one subject, which shall be clearly expressed in its title, and no law shall be revived, or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed.”
By the codification act, practically all of the sections of the Revised Statutes theretofore existing were repealed, and in the same act nearly all of them were re-enacted, with certain slight modifications, under changed classifications and with different numbering. It is, however, very clear that the sections, more than thirteen thousand in number, did involve a great variety of legislative subjects, and that these subjects of legislation, as such, were not clearly expressed in the title of that act.
*167 There are two answers to the contentions of counsel upon this proposition. First, even if it be conceded that the sections of the General Code were not re-enacted according to proper constitutional form, it does not follow that the sections of the Revised Statutes were thereby rendered inoperative. A careful comparison of Section 7316, Revised Statutes, with Section 13692, General Code, relating to confessions in open court, and a comparison of Section 6808, Revised Statutes, with Section 12400, General Code, authorizing trial judges to recommend mercy, and of Section 6818, Revised Statutes, with Section 12432, General Code, relating to robbery, discloses that in the codification no material change was made from the Revised Statutes formerly existing.
The law is clearly settled by this court that a repealing clause is not always operative. In State, ex rel. Walton, v. Edmondson, Auditor, 89 Ohio St., 351, it was declared: “Where an unconstitutional statute contains a clause repealing a prior valid law, for which the latter statute was a substitute, the repealing clause will also be held inoperative, in the absence of an expressed intention to repeal the prior law without regard to the substitute.”
The same doctrine was declared in the case of State, ex rel. Pogue, Pros. Atty., v. Groom, Acting City Solicitor, 91 Ohio St., 1.
In this state of the law relating to legislative repeals, the determination of this question could make no possible difference in the outcome of the instant ease, because if the present sections of the General Code are invalid it is inconceivable that the legislature could have intended that Sections 6808, 6818 and *168 7316, Revised Statutes, should be repealed without providing a valid substitute. If the contentions of counsel for Habig should be sustained, it would simply be held that the court had proceeded under the sections of the Revised Statutes, and the result would be in no wise different.
In this view of the case', it is perhaps unnecessary to determine whether, for the reasons above contended, we have or have not a valid operative General Code in Ohio.
The question seems one of so little difficulty that it may as well be disposed of in this controversy. The constitution does not require that the title of each enactment shall comprehensively define the subject of the proposed legislation, but merely that the subject of the legislation be clearly expressed. The legislative history of the enactment of the General Code is that the 77th General Assembly passed an act requiring the appointment of three commissioners to “revise and consolidate the general statute laws of the state.” In December, 1906, commissioners were appointed. The act providing for their appointment defined their duties as follows:
“The said commissioners shall bring together all the statutes and parts of statutes relating to the same matter, omitting redundant and obsolete enactments, and such as have no influence on existing rights or remedies, making alterations to harmonize the statutes with the constitution as construed by the courts, reconcile contradictions, supply omissions, and amend imperfections in the original acts, so as to reduce the general statutes into as concise and comprehensive a form as is consistent with clear expression of the will of the general assembly, *169 rejecting all equivocal and ambiguous words, and circuitous, and tautological phraseology. They shall arrange the said statutes under suitable titles, divisions, sub-divisions, chapters and sections, with head notes briefly expressive of the matter contained therein with marginal notes of the contents of each section with reference to the original act from which it is compiled. ”
It will be seen, therefore, that the codification was not new legislation or legislation upon any new subject, and there is no rule or reason requiring a comprehensive subject for the act itself, neither can it be stated with reason that there is more than one subject covered, to-wit, codification.
Consistently with the foregoing views, the judgment of the court of appeals must be reversed and the judgment of the court of common pleas affirmed.

Judgment reversed.

Wanamaker, Robinson, Matthias and Clark, JJ., concur.
Hough and Jones, JJ., concur in the judgment.